# EXHIBIT 1

E-FILED
THURSTON COUNTY, WA
SUPERIOR COURT
08/31/2020 10:37:06 AM
Linda Myhre Enlow
Thurston County Clerk

1

2

3

4

5

6

7         SUPERIOR COURT OF THE STATE OF WASHINGTON
               IN AND FOR THURSTON COUNTY

8

9 GRUMP VENTURES L.L.C.,

                  Petitioner/Plaintiff,     No.   **20-2-01958-34**

10

                  v.               **LAND USE PETITION**
                                          **PURSUANT TO RCW CH.**

11 MASON COUNTY,                   **36.70C; COMPLAINT FOR**
                                          **DAMAGES**

12

               Respondent/Defendant.

13

14

15               **I.    INTRODUCTION**

16     1.1    Petitioner/Defendant Grump Ventures, L.L.C. ("Grump Ventures") by and

through its undersigned counsel, files this Complaint and Petition pursuant to RCW Ch.

17 36.70C, the Land Use Petition Act ("LUPA") against Respondent/Defendant Mason

18 County ("County"). This Complaint and Petition concerns a land use decision issued by

19 Mason County rescinding an SM-6 issued to Grump Ventures on June 30, 2017.

20     1.2    Grump Ventures is a family-run LLC that has conducted gravel mining

21 operations at its property since the 1950s. As part of its long-planned expansion of its

22 mine, in 2017, Grump Ventures applied for and obtained a Form SM-6 from the County,

23 which verified the County's approval of the proposed mining operations on the site. Over

24

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 1



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1    the following months, relying on the SM-6, Grump Ventures dedicated considerable
2    resources and efforts towards its permitting applications.

3         1.3    On January 2020, after ex parte meetings with community members
4    opposed to Grump Ventures' project, the County suddenly or revoked the SM-6 without
5    prior notice to Grump Ventures. The County's revocation decision claimed that the
6    mining use had been "abandoned for a period of more than two years," notwithstanding
7    the County's knowledge of the ongoing permitting applications.

8         1.4    On appeal, the County's Hearing Examiner affirmed the County's
9    revocation decision. In reaching that decision, the Hearing Examiner misinterpreted the
10   Mason County Code and common law, improperly placed the burden of proof on Grump
11   Ventures, exhibited bias and unfounded speculation, treated Grump Ventures differently
12   from other property owners and applicants, and completely disregarded the facts presented
13   by Grump Ventures, including evidence that the County failed to rebut. Grump Ventures
14   asks this Court to review and reverse the County's decision; determine that the County's
15   decision-making was illegal, arbitrary, and capricious; and award damages as a result of
16   the injuries it has sustained through the County's actions.

17                              II.    PARTIES

18   A.    Petitioner/Plaintiff and Petitioner/Plaintiff's Attorney

19        2.1    Grump Ventures is the owner of the property at issue located within Mason
20   County, and is the applicant for the land use permit at issue. Grump Ventures' mailing
21   address is P.O. Box 190, Belfair, Washington 98528-0190.

22        2.2    Grump Ventures is represented by Brent Carson and Clara Park of Van
23   Ness Feldman LLP, 719 Second Avenue, Suite 1150, Seattle, Washington 98104. Grump
24   Ventures may be contacted through the undersigned attorneys.

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 2



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

**B.    Respondent/Defendant Local Jurisdiction**

2.3     Mason County is the local jurisdiction that issued the decision at issue. The mailing address of the Auditor of the County is P.O. Box 400, Shelton, Washington 98584.

2.4     The decision-maker of the County who made the decision at issue is the Hearing Examiner for Mason County, Phil Olbrechts ("Hearing Examiner"). On information and belief, the mailing address of the Hearing Examiner is c/o Mason County Department of Community Development, P.O. Box 279, Shelton, WA 98584. The initial decision of Mason County is attached as Exhibit A; the Hearing Examiner's Revised Findings of Fact, Conclusions of Law and Final Decision ("Decision") issued August 11, 2020 is attached as Exhibit B.

**C.    Petitioner/Plaintiff's Standing**

2.5     Grump Ventures has standing under RCW 36.70C.060 as the owner, holder of property interests, and applicant concerning the property to which the Decision applies.

**D.    Jurisdiction and Venue**

2.6     The Court has jurisdiction to review this Petition and Complaint pursuant to RCW 2.08.010, 7.16.160, and 7.24.010.

2.7     Pursuant to the provisions of the Mason County Code ("MCC" or "Code"), the Decision is a "land use decision" appealable to this court exclusively via LUPA petition. *See* MCC 15.11.040. Under LUPA, a "land use decision" is "a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals," on applications for a governmental approval or on an interpretive or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules. *See* RCW

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 3

**Van Ness**
**Feldman** LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1  36.70C.020. The Mason County Code provides that administrative decisions and
2  administrative interpretations are appealable to the hearing examiner, and final decisions
3  of the Hearing Examiner are appealable only via judicial appeal. MCC 15.11.010, -.040.
4  This Petition is timely filed within twenty-one (21) days of the issuance of the Decision.
5  *See* RCW 36.70C.040(3).

6      2.8    Venue is proper in Thurston County pursuant to RCW 36.01.050, which
7  provides that actions against a county may be commenced in the superior court of either of
8  the two nearest judicial districts. Thurston County is one of the two judicial districts
9  nearest to Mason County.

10                    III.    STATEMENT OF FACTS

11     3.1    Grump Ventures hereby incorporates all facts and allegations set forth in
12 the paragraphs above and below as if fully set forth herein.

13     3.2    Grump Ventures is a family-run LLC owned by Russell Scott and operated
14 with significant input and involvement by members of the Scott family. Since
15 approximately 1950, the Scott family has conducted gravel mining operations at the
16 project site, which consists of six contiguous parcels located along 4952 NE North Shore
17 Road in Belfair. The County has historically used the site for gravel mining operations,
18 and in recent years has used the site to stockpile materials.

19     3.3    In 2009, Grump Ventures purchased the six parcels that make up the site
20 from various members of the Scott family and consolidated the parcels into single
21 ownership. In 2017, Grump Ventures submitted an Application for Reclamation Permit to
22 the Washington State Department of Natural Resources. In the application, Grump
23 Ventures proposed to divide the project site into five mining and reclamation segments,
24 which would be worked sequentially in stages over a 100-year period.

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 4



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1    3.4    As part of the Application for Reclamation Permit, Grump Ventures was

2 required to obtain a Form SM-6 for the subject parcels. A Form SM-6 is a form signed by

3 a county or municipality that verifies the county's or municipality's "approval of mining

4 and of the subsequent use of the mine site." WAC 332-18-01002. The Form SM-6 must be

5 signed by a responsible official from the appropriate jurisdiction.

6    3.5    On February 17, 2017, Grump Ventures submitted a Form SM-6 to the

7 County for approval. On June 30, 2017, the County issued a signed Form SM-6 to Grump

8 Ventures. The form poses two questions to local zoning officials, quoted as follows:

9        1. Has the proposed surface mine been approved under local zoning
          and land use regulations?

10

11        2. Is the proposed subsequent use of the land after reclamation
          consistent with the local land use plan/designation?

12 For both questions, the County marked "yes." Additionally, the SM-6 issued to Grump

13 Ventures included a handwritten note stating that Grump Ventures use was "[f]ound to be

14 consistent with the diminishing assets doctrine."

15    3.6    After receiving the SM-6, Grump Ventures submitted applications for its

16 mining proposal, including a Form SM-8A Application for Surface Mining Reclamation

17 Permit and related materials to DNR, a Class IV General Forest Practices Application/

18 Notification for timber removal activities to the County, and a State Environmental Policy

19 Act ("SEPA") checklist.

20    3.7    On June 22, 2018, the County issued and provided notice of a Mitigated

21 Determination of Non-Significance ("MDNS") for the proposal. The SEPA checklist,

22 which was published along with the MDNS, stated that the proposal's compatibility with

23 existing and projected land uses and plans was pursuant to the "[l]ocal zoning code, [and]

24 SM-6 from Mason County." To date, considerable resources have been dedicated toward

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 5



**Van Ness
Feldman** LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1  Grump Ventures' permitting efforts. On information and belief, the County was aware of

2  Grump Ventures' ongoing permitting efforts when it decided to revoke the SM-6.

3      3.8    Public records from the County show that around December 2019, certain

4  members of a group called the Hood Canal Gravel Mining Opposition Association

5  ("HCGMOA") requested private meetings with the County officials to discuss the SM-6.

6  The County did not disclose to Grump Ventures that these meetings were occurring, and

7  Grump Ventures had no notice that the County was undertaking a process to rescind the

8  SM-6, depriving Grump Ventures of any opportunity to review or respond to HCGMOA's

9  opposition.

10     3.9    Shortly after the meetings with HCGMOA members, on January 28, 2020,

11  the County issued an administrative decision stating that "the County is rescinding the use

12  of the SM-6," and that "any past surface mining has been abandoned for a period of more

13  than two years." On February 10, 2020, Grump Ventures filed a timely appeal of the

14  County's administrative decision to the Hearing Examiner, and HCGMOA intervened in

15  the appeal.

16     3.10   During the prehearing process, the Hearing Examiner issued two summary

17  judgment orders. The first concluded that the SM-6 certification served as a final land use

18  decision that could not be collaterally attacked in this proceeding. Specifically, the

19  Examiner concluded that the County could not revisit the validity of the finding in the

20  SM-6 certification that the entirety of Grump's 66.5-acre mining site was a valid

21  nonconforming use under the diminished assets doctrine as of the issuance of the

22  certification on June 30, 2017. The second summary judgment order concluded that

23  Grump Ventures' nonconforming use rights could be terminated by two years of cessation

24  of use for any two-year period between July 1, 2017 and April 3, 2019. Ignoring well-

25  established Washington common law regarding nonconforming uses and the diminishing

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 6

**Van Ness**
**Feldman** LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1   assets doctrine, the Examiner further concluded that continued use required actual mining
2   and gravel extraction, and that mining-related uses such as storage, stockpiling of
3   materials, and the ongoing permitting efforts were insufficient to establish continued use.
4   Finally, the Examiner concluded that Grump Ventures' intent to maintain its
5   nonconforming use right was irrelevant.

6       3.11   The Hearing Examiner held a virtual open-record hearing over four days,
7   on July 16, 22, 23 and 24, 2020. During the open record hearing, Grump Ventures
8   provided testimony from five witnesses who testified regarding Grump Ventures' mining
9   activities between July 1, 2017 and April 3, 2019. In particular, Grump Ventures
10   presented photos, business records, and testimony regarding mining activities that
11   occurred beginning in February and through April 2017, including the digging of test pits
12   and mining that occurred in April 2017.

13       3.12   The County and Intervenor HCGMOA collectively provided testimony
14   seeking to prove that no such mining had occurred. However, as described further below,
15   in many instances the County and Intervenor's testimony failed to refute Grump Ventures'
16   testimony, or at best presented conflicting testimony. Under Washington common law,
17   conflicting testimony is an insufficient basis for terminating a nonconforming use right.

18       3.13   Following the hearing, the Examiner issued the Decision on August 11,
19   2020, denying Grump Ventures' appeal. In the Decision, the Hearing Examiner
20   incorporated his prior summary judgment orders. The Examiner issued the Decision with
21   complete disregard of the facts presented by Grump Ventures. Among other issues, the
22   Examiner disregarded contemporaneous business records on the grounds that the records
23   were "manufactured for the appeal hearing," despite a total absence of evidence that the
24   records were manufactured; the Examiner failed to acknowledge evidence that directly
25   addressed the County and Intervenor's claim that Grump Ventures' mining activities were

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 7



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 12

economically or practically infeasible; and the Examiner credited the testimony of an "expert" who opined that no mining or vegetation removal had occurred on the property, while ignoring unrefuted evidence showing that over 85,000 board feet of timber had been removed from the property. The Examiner also exhibited bias and unfounded speculation against Grump Ventures, treating Grump Ventures differently from other property owners and applicants.

## IV.   STATEMENTS OF ERROR

4.1   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

**A.   The Decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise. RCW 36.70.130(1)(b).**

4.2   The County's rescission of Grump Ventures' SM-6 was based on the County's conclusion that "any past surface mining has been abandoned for a period of more than two years." Ex. B at 1. MCC 17.05.016(a) provides, "If any nonconforming use of land and/or building is abandoned, or ceases for any reason whatsoever (including destruction of the building) for a period of two years or more, then any future use of such land and/or building shall conform to the provisions of this chapter."

4.3   The Decision was the result of several erroneous interpretations of the Code and of well-established Washington case law regarding nonconforming uses. The Decision's erroneous legal interpretations include, but are not limited to the following:

- The Hearing Examiner erroneously concluded that the Code required Grump Ventures to engage in the act of mining every two years. Under common law regarding nonconforming uses and the diminishing assets doctrine, Grump Ventures' activities, including but not limited to its

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 8



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1   ongoing permitting applications, maintenance of stockpiles and equipment,
2   and maintenance of the pit's availability for use by contractors and by the
3   County, were sufficient to continue the nonconforming use right.

4   • The Hearing Examiner erroneously concluded that Grump Ventures' intent
5   to continue mining operations was irrelevant to the abandonment inquiry,
6   notwithstanding the requirement of intent established under the Code and
7   common law.

8   • The Hearing Examiner erroneously considered evidence pre-dating the
9   SM-6's issuance, even after the Examiner concluded that the SM-6 was a
10   final, unappealed land use decision that could not be collaterally attacked
11   and that established the existence and validity of Grump Ventures'
12   nonconforming use right as of June 30, 2017. The Examiner's findings
13   regarding Grump Ventures' use in the years prior to the SM-6's issuance
14   amount to an improper collateral attack on the SM-6.

15   • While the Decision facially acknowledged that the County bears the heavy
16   burden of proving abandonment, the Hearing Examiner applied the burden
17   of proof erroneously. Among other things, the Examiner discounted Grump
18   Ventures' testimony and evidence as self-serving without applying the
19   same standard to the project opponents' testimony, who had a similar
20   interest in providing self-serving testimony. As another example, the
21   Examiner disregarded trucking slips maintained by a third-party trucking
22   contractor on the grounds that the slips were not "independently
23   verifiable." In applying such standards, the Examiner improperly placed a
24   high burden of proof on the property owner, in contravention of well-
25   established Washington case law.

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 9



Van Ness
Feldman LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

**B.**     **The Decision is not supported by evidence that is substantial when viewed in light of the whole record before the court.  RCW 36.70C.130(1)(c).**

4.4     The Hearing Examiner's Decision credited the entirety of the County's and Intervenors' evidence, but in doing so, the Examiner failed to acknowledge or even mention many key pieces of Grump Ventures' evidence that discredited or contradicted the County's and Intervenors' evidence.

4.5     As one example, the Hearing Examiner relied on the Intervenors' expert's use of precise methodologies used to calculate quantities of extracted materials in mining operations. However, during cross, the expert readily admitted that he did not use such methodologies in his analysis for this case. Rather, the methodology the expert used was so unreliable that the expert failed to recognize any evidence of  logging of over 85,000 board feet of timber that had occurred in the subject property, despite Grump Ventures' submission of undisputed evidence that such logging had occurred. The expert's inability to recognize the drastic signs of logging, signs of which were visible even to the untrained layperson's eye, calls into question the expert's reliability and credibility and the Decision's reliance on the expert. The expert also provided conflicting testimony about the accuracy of his methods.

4.6     Other evidence that the Examiner failed to address in the Decision include evidence that directly addressed and rebutted the County and Intervenor's claims that Grump Ventures' mining activities were physically or economically impossible. This evidence includes, but is not limited to, evidence regarding the speed of vegetation growth, the nonuse of the road where Grump Ventures dug test pits in 2017, the closure and unavailability of a nearby pit, and the unrefuted records of additional equipment brought into the pit on April 26, 2017. By failing to address significant portions of the

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 10



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

evidence in the record, much of which was unrefuted, the Decision made findings that were not supported by substantial evidence.

**C.**     **The Decision is based on a clearly erroneous application of the law to the facts. RCW 36.70C.130(1)(d).**

4.7    The Decision is a clearly erroneous application of the law, including but not limited to MCC 17.05.016(a) and common law regarding nonconforming uses and the diminishing assets doctrine.

**D.**     **The Decision violates Grump Ventures' constitutional rights. RCW 36.70C.130(1)(f).**

4.8    The Decision, including but not limited to the emphasis placed on Grump Ventures' interest in its nonconforming use right, constituted a violation of Grump Ventures' right to substantive and procedural due process of law, equal protection of the law, and to be free from arbitrary, capricious and unlawful conduct. The errors include but are not limited to the Hearing Examiner's bias and speculation against Grump Ventures and the treatment of its appeal differently due to Grump Ventures' identity.

**E.**     **The Decision was based on unlawful procedure and failure to follow a prescribed process, and was outside the Hearing Examiner's authority or jurisdiction. RCW 36.70C.130(1)(a), (e).**

4.9    The Examiner engaged in unlawful procedure, failed to follow a prescribed process, and acted outside the Examiner's authority or jurisdiction in issuing the Decision, including but not limited to the Examiner's consideration of evidence prior to the SM-6's issuance, resulting in a collateral attack on the SM-6's basis and being internally inconsistent with the Examiner's summary judgment ruling.

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 11



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

## V.   CAUSES OF ACTION

### A.   First Cause of Action: Land Use Petition – Chapter 36.70C RCW

5.1   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.2   Grump Ventures has alleged facts sufficient to demonstrate that the Decision was based on unlawful procedure and failure to follow a prescribed process, is an erroneous interpretation of the law, is not supported by substantial evidence when viewed in light of the whole record, is a clearly erroneous application of the law to the facts, is outside the Hearing Examiner's authority or jurisdiction, and violates Grump Ventures' constitutional rights, under RCW 36.70C.130.

5.3   For these reasons, the Decision should be reversed and set aside.

### B.   Second Cause of Action: Damages – Chapter 64.40 RCW

5.4   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.5   The County's acts and/or omissions set forth above are unlawful and arbitrary and capricious and/or in excess of the County's lawful authority.

5.6   The County knew or should have reasonably known of the unlawfulness of its acts and/or omissions.

5.7   The Decision limits the use of Grump Ventures' property in excess of lawful authority. Without the SM-6, Grump Ventures is precluded from obtaining necessary state permits, and prohibited from pursuing its proposed mining operations

5.8   The County's Decision is arbitrary and capricious and is resulting in ongoing delay of Grump Ventures' project.

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 12

Van Ness
Feldman LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 17

5.9    Grump Ventures has suffered actual, ongoing damages in an amount to be proved at trial, including but not limited to the costs associated with the ensuing permitting delay, attorneys' fees, and associated litigation costs as a result of the improper Decision.

5.10    As the prevailing party, Grump Ventures is entitled to recover costs and reasonable attorneys' fees, pursuant to RCW 64.40.020, in an amount to be proved at trial.

**C.    Third Cause of Action: Liability for Violation of Constitutional Rights under 42 U.S.C. § 1983**

5.11    Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.12    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

5.13    The Decision violates rights secured by the Constitution and the laws of the United States and State of Washington, and was issued by the County's Hearing Examiner, who was acting under color of law.

5.14    Grump Ventures has a cognizable property interest in its SM-6, which constitutes a protected property interest.

5.15    Grump Ventures also has a cognizable property interest in an impartial review of its appeal of the SM-6's rescission, and in otherwise receiving the due process guaranteed under the laws of the United States and the State of Washington. The right to

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 13



Van Ness
Feldman LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 18

1     an impartial decision maker is a right implicit in the concept of ordered liberty. *Maytown*
2     *Sand & Gravel, LLC v. Thurston Cty.*, 191 Wn.2d 392, 435, 423 P.3d 223 (2018).

3        5.16    The Hearing Examiner was not an impartial decision maker. Among other
4     things, the Decision disregarded Grump Ventures' evidence without explanation, singled
5     out and maligned Grump Ventures, exhibited bias, made findings inconsistent with prior
6     rulings, and treated Grump Ventures differently from other property owners and
7     applicants. The County's and the Hearing Examiner's "shock[] the conscience and
8     interfere[] with rights that are implicit in the concept of ordered liberty." *Maytown Sand &*
9     *Gravel*, 191 Wn.2d at 430. Because decisions like this one (which was made in a climate
10    of political pressure) are more susceptible to an abuse of authority, they "require[] a
11    higher degree of judicial scrutiny than is normally appropriate for administrative action."
12    *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 578 P.2d 1309, 1315 (1978).

13        5.17    For these reasons, the Decision constitutes a deprivation of rights
14    actionable under 42 U.S.C. § 1983.

## VI.   REQUEST FOR RELIEF

16       Based on the foregoing, Grump Ventures requests the following relief:

17        1.   A ruling that Grump Ventures has met its burden of proof under one or
18            more of the standards listed in RCW 36.70C.130;

19        2.   Reversal of the Decision;

20        3.   A ruling that Grump Ventures' nonconforming use right remains valid, and
21            remand to the County for further proceedings;

22        4.   In the alternative, a ruling on the specific issues raised in this Petition, and
23            remand to the County for further processing consistent with such rulings
24            and issuance of a subsequent decision on the merits;

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 14



Van Ness
Feldman LLP
719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

1   5.   An award of damages and attorneys' fees and costs as authorized under

2        RCW 64.40 and 42 U.S.C. § 1988(b);

3   6.   For permission to amend the pleadings to conform to the proof; and

4   7.   For such other and further relief as may be just and equitable.

5

6   DATED this 31st day of August, 2020.

7

8                                        VAN NESS FELDMAN LLP

9

10   

11                                        Brent Carson, WSBA # 16240
                                          Clara Park, WSBA # 52255

12                                        719 Second Avenue, Suite 1150
                                          Seattle, WA 98104
13                                        T: (206) 623-9372
                                          E: brc@vnf.com; cpark@vnf.com
14

15                                        *Attorneys for Petitioner/Plaintiff Grump*
                                          *Ventures L.L.C.*
16

17

18

19

20

21

22

23

24

25

LAND USE PETITION PURSUANT TO RCW CH. 36.70C;
COMPLAINT FOR DAMAGES - 15

**Van Ness**
**Feldman** LLP
719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 20

# CERTIFICATE OF SERVICE

I, Donna Hammonds, declare as follows:

That I am over the age of 18 years, not a party to this action, and competent to be a witness herein:

That I, as a Legal Assistant in the office of Van Ness Feldman LLP, caused true and correct copies of the following documents to be delivered as set forth:

    1.    Land Use Petition Pursuant to RCW CH.36.70C; Complaint for Damages;
    2.    Certificate of Service

and that on the date listed below, I addressed said documents and deposited them for delivery as follows:

| | |
|---|---|
| Paddy McGuire<br>Mason County Auditor<br>411 N 5th St<br>Shelton, WA 98584 | ☒ By First Class Mail<br>☒ By Legal Messenger<br>☐ By E-Mail: |
| McKenzie Smith<br>Clerk of the Board<br>Clerk of the Commissioners<br>411 N. 5th<br>P.O. Box 279<br>Shelton, WA 98584 | ☒ By First Class Mail<br>☒ By Legal Messenger<br>☐ By E-Mail: |
| Timothy W. Whitehead<br>Chief Deputy Prosecuting Attorney<br>Michael K. Dorcy<br>Mason County Prosecutor's Office<br>411 N. 5th<br>P.O. Box 639<br>Shelton, WA 98584-0639 | ☒ By First Class Mail<br>☒ By Legal Messenger<br>☐ By E-Mail:<br>TimW@co.mason.wa.us<br>MichaelD@co.mason.wa.us |
| Mason County Hearing Examiner's Office<br>Mason County Department of Community Development<br>P.O. Box 279<br>Shelton, WA 98584 | ☒ By First Class Mail<br>☐ By Legal Messenger<br>☐ By E-Mail: |

CERTIFICATE OF SERVICE - 16

**Van Ness Feldman** LLP

719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 21

1

     I hereby certify that I have this day served the foregoing document upon all parties

2

of record in this proceeding, by authorized method of service pursuant to WAC 463-30-

120(3) and (4).

3

     EXECUTED at Seattle, Washington on this 31st day of August, 2020.

4

5

                                s/*Donna Hammonds*

6

                                  Donna Hammonds, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF SERVICE - 17



719 Second Avenue Suite 1150
Seattle, WA 98104
(206) 623-9372

NOTICE OF REMOVAL OF ACTION - 22

# EXHIBIT A



**MASON COUNTY**
**COMMUNITY SERVICES**

Building, Planning, Environmental Health, Community Health

January 28, 2020

Russell Scott
Grump Ventures, LLC
PO Box 190
Belfair, WA 98528

**RE: Grump Ventures, LLC**

Dear Mr. Scott,

Mason County Community Services has made an Administrative Determination that Grump Ventures, LLC does not have a legal nonconforming use for surface mining in the Rural Residential 5 (RR5) zone on parcel numbers 22202-32-00000 and 22202-52-00026.

When the County made the determination to sign the Department of Natural Resource's "County Approval for Surface Mining (SM-6 Form)" on June 30, 2017, it was based on information shared with the Planning Department regarding past use of the subject parcels and interpretation of the Diminishing Assets Doctrine.

Since that time, the Department has received additional information that disputes the use of surface mining as a legal nonconforming use and challenges the application of the Diminishing Assets Doctrine. After consultation with legal counsel, the County no longer maintains that current use of the property is legal nonconforming surface mining and acknowledges the Diminishing Assets Doctrine does not apply to the subject properties. Therefore, the County is rescinding the use of the SM-6 Form by the DNR.

Current zoning does not support surface mining and any past surface mining has been abandoned for a period of more than two years.

Mason County Code (MCC) addresses nonconforming uses:

> ***17.05.016 - Abandonment; reconstruction.***
>
> *(a)    If any nonconforming use of land and/or building is abandoned, or ceases for any reason whatsoever (including destruction of the building) for a period of two years or more, then any future use of such land and/or building shall conform to the provisions of this chapter. Upon written request of the property owner, the administrator shall grant one, one-year extension to the aforementioned two-year period.*

Multiple dump truck loads of sand and gravel were taken from the Grump Venture's property in April of 2019. The County issued a Stop Work Order and required Grump Ventures, LLC either apply for an After-the-Fact Land Modification Permit (MCC 14.44) or receive a Surface Mine Reclamation Permit from the DNR. It was the County's understanding at that time that Grump Ventures, LLC was going to pursue a Reclamation Permit from the DNR.

If Grump Ventures, LLC wishes to proceed with a Surface Mine Reclamation Permit, the County will require the property to be rezoned from Rural Residential 5 (RR5) to Rural Natural Resource (RNR) before signing a new SM-6 Form. Rezone requests require a public hearing with the Planning Advisory Commission followed by another public hearing with the Board of County Commissioners prior to a final decision. SEPA review is required for rezone requests.

Regardless of any future action or no-action, the County is waiving its previous requirement to apply for an After-the-Fact Land Modification Permit for the activity that occurred in April 2019.

If you have any questions regarding this Administrative Decision, do not hesitate to contact me. This administrative determination may be appealed according to Mason County Development Code, Title 15, Chapter 15.11 Appeals.

Sincerely,

Dave Windom, MSHS, Director Mason County Community Services

cc:     Bryan Massey L.G., Surface Mine Specialist, Department of Natural Resources
        Kell Rowen, Planning Manager
        Tim Whitehead, Deputy Prosecuting Attorney

NOTICE OF REMOVAL OF ACTION - 25

# EXHIBIT B

1
2
3
4
5
6
7                    BEFORE THE HEARING EXAMINER OF MASON COUNTY

8  | RE: | |
9  | | |
10 | Grump Ventures LLC | REVISED[1] FINDINGS OF FACT, |
11 | Administrative Appeal of Administrative | CONCLUSIONS OF LAW AND FINAL |
12 | Determination Rescinding Form SM-6 | DECISION |
   | Interpretation | |
13
14
15

16                              **Summary**

17         The Grump Ventures LLC ("Grump") appeal is denied.  Mason County's
18  rescission of its SM-6 Certification on January 28, 2020 is sustained on the grounds that
19
20  Grump lost its nonconforming use mining rights through cessation of use from April 3,
21  2017 through April 3, 2019.

22         This Decision should not be construed as extinguishing all of Grump's
23  nonconforming use rights.  The SM-6 rescinded by Mason County was for the County's
24  initial finding that Grump had nonconforming use rights to operate a 66.5 acre mine at
25  levels of activity that trigger the need for a Department of Natural Resources reclamation
26  permit.  That type of operation is a far cry from Grump's historical use of its property

27  _____

28  [1] The August 10, 2020 Final Decision was revised by the addition of three paragraphs to the end of Finding
29  of Fact No. 14.  The three paragraphs clarify the determination that whether mining occurred in
    February/March was "somewhat questionable."  The information in those three paragraphs was a key part
30  of the finding and had been unintentionally omitted from the August 10, 2020 decision.

Final Decision
PAGE 1

from at least 1995.  As outlined in the Findings of Fact, Grump operates what could be called a hobby mine, which is used sporadically and infrequently, with years of inactivity between minor incidents of excavation and mining related activities. There is a vein of case law that holds that such infrequent use is characteristic of many quarry operations. Since such periods of inactivity can exceed the time limits of nonconforming use termination clauses, courts have held that the time limits do not apply to them.

   An important caveat to Grump's retention of nonconforming use rights, however, is that its protected use is generally limited to its historical use.  In short, Grump may have a nonconforming hobby mine, but it does not have a nonconforming 66.5-acre commercial mine.  Whether, and to what extent, Grump has such a nonconforming use is beyond the scope of this Decision.  The issue is just identified at this juncture to accurately define the scope of this Decision, which is to address the validity of the SM-6 rescission as it applies to the mining proposed in Grump's reclamation permit application.

   The findings of this decision should also not in any way be construed as a judgment on the character or honesty of witnesses who participated in the appeal hearing. They are based upon the evidence presented into the record.  There are findings made that suggest that testimony provided by one or more Grump witnesses was not credible.  These findings are based upon a preponderance of evidence, which means there is still a reasonable possibility that everything the witnesses said is accurate.

   In his closing, Mr. Whitehead correctly noted that the County was tasked with a very high burden of proof, establishing a negative, that no mining had occurred over a two-year period.  This burden was initially met by the testimony of Rick Glenn, Earl Iddings and Pat Byrne and several other neighbors.  Mr. Glenn is an undisputed expert in using aerial and terrestrial photographs to assess mining and forestry activity.  Mr. Glenn used numerous aerial and terrestrial photographs to find that no mining of any appreciable amount occurred on Grump's proposed mining area at least since 2012.  Mr. Glenn's assessments may not be as precise as he testified, as it does appear that he missed some logging in 2011 and there is no question he incorrectly identified the composition of a

Final Decision
PAGE 2

driveway.  However, even with these errors in judgment, overall the methodology used by Mr. Glenn and the evidence he presented in photographs during his testimony, in conjunction with neighbor observations, lead to the conclusion that no mining occurred between April 3, 2017 and April 3, 2019.

Mr. Glenn's observations were corroborated by the testimony of Earl Iddings and Pat Byrne.  Mr. Iddings lives adjacent to the Grump pit to the north, separated by a parking lot.  Mr. Byrne lives across North Shore Road from the entrance to the Grump pit.  Mr. Iddings can see into the pit area and hear the use of machinery in it from inside his home.  Mr. Byrne can also hear the use of machinery in the Grump pit from his home.  They both testified that they heard and saw the County's use of the pit in 2014 and 2015 and both heard and saw use of the pit by Peninsula Topsoil in 2019 (although Mr. Iddings was away on vacation for a portion of the 2019 work).  Both Mr. Byrnes and Mr. Iddings testified that they saw and heard no mining activity on the Grump properties for periods of time that included April 3, 2017 through April 3, 2019.  The Intervenors provided Declarations from 14 households in the immediate vicinity who all stated they were not aware of and did not see or hear evidence of mining activity at the Grump Pit in 2017.  As demonstrated by Grump counsel, the neighbors of the area generally lived on large lots with deep driveways with significant amounts of vegetation that buffered them from activity they could have seen or heard from the Grump property.  However, in toto, the large number of neighbors who heard and saw nothing corroborates the findings of Mr. Glenn, that no mining occurred in between April 3, 2017 and April 3, 2019.

In response to the evidence showing no mining activity in April 3, 2017 through April 3, 2019 Grump presented evidence on two instances of mining activity, specifically 50-60 cubic yards of gravel extraction on April 22, 2017 and the digging of two test pits in April or early May 2017.  More likely than not such activity did not occur.  From the evidence presented, it appears that mining activity that may have occurred in February 2017 was misrepresented by Grump witnesses as having been extended into April 2017.  The evidence suggests that those with an interest in the Grump mine didn't realize they

Final Decision
PAGE 3

needed to engage in mining activity in the two years prior to April 2019 until they received the County's SM-6 rescission in January 2020. This substantial business opportunity, potentially lost simply because mining was done in February 2017 instead of April 2017, would have seemed nonsensical and fortuitous at the time to persons associated with Grump. It would have been incredibly tempting to modify the facts just a little to extend the February mining activity just a few weeks into April. The evidence establishes more likely than not this is precisely what occurred.

The evidence establishing the absence of any activity in April is substantial, based upon independent observations of no mining activity and highly dubious evidence presented by Grump. Overall, a major problem with the evidence presented by Grump for all of its assertions in its 20-hour hearing was that none of the evidence was independently verifiable. Almost all of the documentation and testimony provided by Grump was made by people closely associated with the Grump business. Every single financial document and receipt presented by Grump was a document prepared by Grump or Peninsula Topsoil that could have been easily manufactured for the appeal hearing.

This evidentiary shortcoming was most apparent in Grump's alleged mining activity on April 22, 2017. A Grump witness stated that he had mined 30-60 cubic yards that day for delivery to a development at Timberline. Grump presented no invoice that would have submitted to the developers of Timberline for the materials delivered, no bank statement for receipt of any monies for such delivery and no cancelled check from the Timberline developer for payment. The only documentation Grump presented to prove that highly critical work on April 22, 2017 was an invoice showing that a loader had been moved off the Grump pit on April 26, 2017.

In addition to the highly dubious documentation supporting claims of mining on April 22, 2017, it is also improbable that anyone doing the mining would have found it feasible. Jason Johnson testified that the material he excavated from the Grump pit would have cost $0.50 to $1.00/cubic yard. Therefore, the 50-60 cubic yards that he mined was only worth at most $60. Even if Peninsula Topsoil was able to acquire it for free from

Final Decision
PAGE 4

1   the Grump pit, it wouldn't have made any economic sense to get it there because the
2   trucking cost was $2/minute.  Peninsula Tops Soil had a mine right next to the Timberline
3   Development as well as one three miles away from the development where it could have
4   obtained the gravel.   The Grump pit was six miles away from the development and it
5   took 5 to 6 truckloads to haul the material to the development site.

6          The testimony of Intervenor witnesses added further implausibility to the April
7   22, 2017 mining activity.  Earl Iddings, who owns a construction company with several
8   pieces of mining equipment, testified that gravel would not be extracted from the pit in
9   the manner testified by the Grump witness.  The Grump witness testified that he "pulled"
10  gravel from the face of the gravel pit bank behind some stream rock stockpiles.  As
11  testified by Mr. Iddings, the embankment in question is near vertical with tall trees and
12  exposed roots overhanging the top.  Any removal of gravel from that embankment face
13  could result in the trees toppling onto the person engaged in the excavation and for that
14  reason violates mining regulations.  Finally, there's also the testimony of Mr. Glenn that
15  he observed no mining in that area and that the amount of vegetation in pictures taken
16  shortly after the alleged mining showed a large amount of vegetation that was not
17  consistent with what would have had to be cleared for the alleged mining.
18
19         Neighbors who visited the site made observations similar to those of Mr. Glenn.
20  Mr. Iddings who stated he hadn't seen signs of excavation in either 2017 or 2018 and that
21  in both cases he witnessed vegetation overgrowth that appeared consistent from year to
22  year; Mr. Anspach was at the pit and took pictures on July 14, 2018 and noted the area
23  was then covered in vegetation; and Mr. Byrne who stated he has been on the property
24  about once per year and was on the property in June of 2018 and saw no sign of equipment
25  use in the prior three years. Each man stated they had never witnessed any excavation in
26  2017 and saw just overgrown vegetation.
27         The issue of whether the test pits were dug after April 8, 2017 is not as clear cut
28  as the mining work for the Timberline development.  The Grump witness testified that he
29  did that work in late April or early May of 2017 in the area of a logging road.  There are
30

Final Decision
PAGE 5

two sources of evidence that render this testimony dubious.  First, Mr. Glenn had looked closely at this area during the appeal hearing and found that brush had steadily grown in this logging area and made it impassable by April/May of 2017.  His observations were confirmed by the testimony of Earl Iddings, who noted that from his site visits starting in 2005-6 and then twice or three times per year from 2015 forward, he found the site of the test pits increasingly overgrown and eventually  impassable, even to pedestrians.  As testified by Mr. Glenn, if mining equipment had been brought up to that area in late April or early May 2017, the road vegetation would have shown up as cleared in the 2018 photographs he looked at.

Further, as testified by Mr. Iddings, test pits aren't dug in the middle of logging roads because they have a high potential of undermining them, either by tapping into a water table and flooding the road or simply by creates soft spots in the road that eventually undermine their utility. As testified by Mr. Iddings, there were plenty of places to dig the test pits on the side of the road, it made no sense to do them in the road.  For these reasons, along with the fact that the April 22 testimony from the same witness was very likely not accurate and the strong incentive to modify evidence of mining activity after April 8, 2017, the preponderance of evidence is found to establish that no test pits were dug in April or May 2017.

**Exhibits**

See Appendix A.

**Findings of Fact**

**Procedural:**

1.    <u>Reclamation Permit</u>.   In 2017, Grump Ventures submitted an Application for Reclamation Permit to the Washington State Department of Natural Resources ("DNR").

Final Decision
PAGE 6

2.    <u>SM-6 Form</u>.  As part of the reclamation period review process, DNR requires local zoning officials to fill out an "SM-6" form.  The form poses two questions to local zoning officials, quoted as follows:

> *1.    Has the proposed surface mine been approved under local zoning and land use regulations?*
> *2.    Is the proposed subsequent use of the land after reclamation consistent with the local land use plan/designation?*

The form provides a check box of "yes" or "no" for this inquiry.  The form requires no other information from local officials.

3.    <u>SM-6 Certification</u>.  On June 30, 2017, the Mason County Director of Community Services filled out the SM-6 form for Grump's reclamation permit application.  The Director checked the yes box to both questions of the form with a footnote providing "*[f]ound to be consistent with the diminishing assets doctrine*."    This document is referred to as the "SM-6 Certification" in this Decision.

4.    <u>SM-6 Rescission</u>.  On January 28, 2020, the Director of Community Services issued a self-described "administrative determination," referred to in this Final Decision as the "SM-6 Rescission" The SM-6 Rescission stated that based upon new information the County was "*rescinding the use of the SM-6 Form by the DNR*."  As legal grounds for the rescission, the SM-6 Rescission quoted MCC 17.05.016.  MCC 17.05.016 provides that legal nonconforming use status can be lost through two years of abandonment or cessation of use for any reason.  The SM-6 Rescission provided that it was subject to administrative appeal under Chapter 15.11 MCC, Administrative Appeals.

5.    <u>Appeal</u>.  Grump filed an appeal of the SM-6 Rescission on February 10, 2020.  The appeal was limited to asserting that LUPA case law prohibits Mason County from re-assessing the validity of the SM-6 certification in its SM-6 Rescission.  The appeal also took the position that Mason County has the burden to prove that Grump had to have intended to abandon its use for two years to lose its nonconforming use status due to two-year abandonment under MCC 17.05.016.  Grump asserts it had no such intent.

Final Decision
PAGE 7

6.      Motion to Intervene.   On February 27, 2020, the Hood Canal Gravel Mine Opposition Association ("Intervenors") filed a motion to intervene.   The motion was granted by order dated March 26, 2020.

7.      Summary Judgment.   Two summary judgment orders were issued in this appeal. The first held that the SM-6 certification served as a final land use decision that could not be collaterally attacked in this proceeding.   Specifically, this proceeding could not revisit the validity of the finding in the SM-6 certification that the entirety of Grump's 66.5-acre mining site was a valid nonconforming use under the diminished assets doctrine as of the issuance of the certification on June 30, 2017.   The second summary judgment motion held that Grump's nonconforming use rights could be terminated by two years of cessation of use for any two-year period between July 1, 2017 and April 7, 2019[2].

8.      Hearing.   The Grump appeal hearing was held over four days on July 16, 22, 23 and 24, 2020.   An exhibit list was distributed for comment and responses from the parties were received on August 7, 2020.    The hearings were held virtually on the Zoom application.    Hearing participation was limited to Grump, Mason County and the Intervenors.

**Substantive:**

9.      Grump Properties.   As identified in Grump SM-6 form, Ex. C-1, the Grump mining properties are 66.5 acres in total area.   As concluded in a memo by Mason County Planner Michael MacSems, an existing gravel pit extends over five parcels in this 66.5-acre area, totaling only 1.18 acres in area.   See Ex. I-118.   The remaining 66.5 acres is undeveloped with some logging roads.   See Ex. I-1.

10.      Relationship of Grump Witnesses.   Grump is owned and operated by Russell Scott.   Several persons who testified have the last name of Scott.   All such persons are within the extended family of Russell Scott.   The remaining Grump witnesses are Johnsons, who are also all related to each other.   One or more Johnsons own and operate

---

[2] Evidence presented in this hearing clarified that mining activity occurred at the Grump pit as early as April 4, 2017.   Consequently, this Decision modifies the end date from April 7, 2019 to April 3, 2019.

Final Decision
PAGE 8

Peninsula Topsoil and Olympic Trucking.  The Johnsons and the Scotts have been family friends and have been working in business together for decades.  Russell Scott testified that they shared a household when he was a child.   Jason Johnson owns Olympic Trucking.  His uncle, Jack Johnson, owns Peninsula Topsoil.

11.   <u>County Stop Work on April 8, 2019 Excavation</u>.  Grump authorized extensive extraction work at its pit around April 4, 5 and 8, 2019 as documented in trucking slips (Exhibit A-7).  Kell Rowan, Mason County Planning Manager, issued a verbal stop work order on April 8, 2020 and mining ceased at that point.  The second summary judgment ruling in this appeal erroneously presumed a written stop work order had been issued, but Ms. Rowen in her testimony identified it was only verbal.  The verbal order is not a code enforcement tool identified in the MCC, but rather was used by Ms. Rowen in lieu of issuing a formal written stop work order that is authorized by the MCC.

12.   <u>General Historical Use Infrequent and Sporadic</u>.  Overall, historical use of the Grump pit has been infrequent and sporadic, likely significantly less than once per every two years since at least 1995.

The Grump pit appears to have been created in the 1940s to provide fill for the development of waterfront lots. In support of a favorable finding in Grump's SM-6 form, Grump submitted a "green file" to Mason County that documented the historical use of the property.  Letters in the file outlined that the pit had been operated in the 1940s through 1960s, with undated photographs depicting mining and logging activity that appear to be decades old.  See Ex. C-9.  None of the photographs appear to depict any mining within the last twenty years.  Earl Iddings testified that the pit had been originally dug to provide fill for the development of waterfront lots in the area and Russell Scott testified that the pit had been used to provide fill for 100 bulkheads in the area.

1995 appears to be the latest the mine was regularly used based upon comments made by Russell Scott in a July 2018 meeting with Jack Johnson, Earl Iddings and Brad Carey. Earl Iddings and Brad Carey are project opponents and live near the project site. According to the testimony of Carey and Iddings, Russell Scott and Jack Johnson stated

Final Decision
PAGE 9

there had been active mining in the 1950s and 1960s but no active mining since 1995. In surebuttal Russell Scott testified he never said there was no mining in the pit since 1995. Mr. Scott testified there have been contractors in there since then. He stated some of those contractors put in curtain drains on his property in the 1990s and in exchange he gave them access to the pit. There have been other people in and out of there was well over the years. Rich Moore was another person in there. Mr. Scott stated that the County's always been in there. Prompted from Ms. Clark, Mr. Scott also confirmed there was work in 2017 as well.

The differing accounts of the 1995 statements appear most likely to be based upon a miscommunication of what level of mining was conducted since 1995. Mr. Carey and Mr. Iddings were not very precise about what Mr. Scott and Mr. Johnson said about 1995. Mr. Carey testified that at the July, 2018 meeting Mr. Scott and Mr. Johnson were of the impression that the Grump mining in the 1950s and 1960s was sufficient to permanently set their nonconforming use status. Under this understanding, they would have been comfortable in disclosing that the mining was no longer of that high intensity after 1995, believing such an admission would not jeopardize their nonconforming use rights. Mr. Scott knew about at least a couple instances of minor mining activity that has occurred since 1995 and would not have said mining ceased entirely. At the same time, Mr. Carey and Mr. Iddings would likely not manufacture the 1995 date in its entirety. The most likely explanation is that Mr. Scott and Mr. Johnson had disclosed that the high level of mining activity that they believed permanently set Grump's nonconforming use rights had abated by 1995.

A documented history of regular and continuous mining in the Grump pit since 1995 would have gone a long way in corroborating Grump's position that mining occurred in April 2017. Despite this, the administrative record only contains documentation and testimony identifying four specific instances of activity since 1995. Grump showed a photograph in 2012 showing a loader in the pit operated by Richard Moore and provided testimony that Mr. Moore mined the pit at that time. A County

Final Decision
PAGE 10

1   witness, Richard Larue, testified that the pit was used by Mason County in 2014 and 2015
2   to store stockpiles of chip seal and stream bed excavation.  Mr. Larue testified that the
3   County did not do any excavation of the Grump pit. Grump presented trucking slips for
4   alleged work done in February through April 2017.  Ex. A-6.  It is also uncontested that
5   Grump did significant excavation of the pit in April 2019, which was shut down by verbal
6   order of Mason County.

7         What is particularly revealing in Russell Scott's surrebettal on the subject of his
8   1995 statement is that he struggled to find any instances of repeated mining after 1995.
9   When pressed by his own attorney as to what mining activity had occurred at the Grump
10   pit since 1995, he could only come up with the mining identified in the preceding
11   paragraph and some additional mining he authorized some contractors to do in 1995 in
12   exchange for installing curtain drains on his property.
13
14         In the green file, Scott and Johnson witnesses generally spoke of regular mining
15   occurring within the last few years, but identified no specific instances except for seeing
16   hauling trucks at the mine on one or two occasions.  Undated photos of mining activity
17   are included in the file but given the antiquated nature of the vehicles in those
18   photographs, they are clearly decades old, with several labelled as "my old pit pics." Kari
19   Scott testified that some gravel from the pit was used for her driveway, but such a minor
20   activity likely doesn't qualify as mining.

21         As previously noted, to establish that mining had occurred in 2017 it would have
22   clearly been in Grump's interest to establish regular and continuous mining activity in
23   years prior.  This would have been easy to do by a combination of tax records and bank
24   statements.  Yet the record contains virtually no documentation or any concrete evidence
25   of any mining activity prior to 2017 except for the Moore work in 2012, the County's
26   stockpiling in 2014-15, and the mining in 1995 authorized as payment for installing
27   curtain drains.  From this information, it is concluded that the preponderance of evidence
28
29
30

Final Decision
PAGE 11

1   establishes that from 1995 through 2017 the Grump pit was used infrequently and
2   sporadically, with periods of inactivity often extending for several years at time.[3]

3   13.   Glenn and Neighbor Testimony Establish Prima Facie No Mining.   The testimony
4   of Rick Glenn and neighboring property owners establish a prima facie case of no mining
5   activity at the 66.5-acre Grump site between 2015 and 2018.

6         Rick Glenn is an undisputed expert in interpreting aerial and terrestrial
7   photographs to assess mining and forestry activity.   Using aerial and terrestrial
8   photographs, Mr. Glenn concluded that the 66.5-acre Grump site has not been logged
9   since 1989, that the perimeter of the Grump pit has not moved since 2000 and that no
10  gravel has been extracted from the pit since 2012. Glenn Testimony, 7/21/20. Mr. Glenn
11  stated that he would be able to see any gravel extraction exceeding 18.5 cubic yards,
12  assuming it wasn't a level extraction of a few inches over a large area. Glenn Testimony,
13  7/23/20.

14        Mr. Glenn is a forester. He worked for the US Forest service from 1976-1979. He
15  has worked in aerial photogrammetry since 1979 with DNR. He's worked with
16  photogrammetry for WSDOT, DNR and Arizona DOT. He has extensive experience in
17  aerial photo interpretation. He's used aerial photography to determine how much material
18  was in a pit before and after excavation to determine how much material was available
19  and how much was used by a road project. This was used as a double check on materials
20  invoiced by contractors. Mr. Glenn testified photogrammetry is so accurate it is rarely
21  disputed.

22

23

24

25

26  _____
    [3] Throughout the course of the appeal proceedings Grump has objected to any consideration of evidence
27  prior to the issuance of the SM-6 certification on the basis that such consideration would be an unpermitted
    collateral attack on the SM-6 determination that the Grump mining operation was a valid nonconforming
28  use as of the date of issuance of the certification.  However, there are no specific findings or conclusions
    issued as part of the SM-6 certification except for a reference to the diminished assets doctrine.  Beyond
29  application of the diminished assets doctrine, it is unknown what facts or law the County found pertinent
    in making its SM-6 certification, so there is no basis to conclude that findings on issues such as periods of
30  mining inactivity are inconsistent with the SM-6 certification and hence qualify as a collateral attack on
    that certification.

    Final Decision
    PAGE 12

1       Mr. Glenn heightened the accuracy of his analysis by using "stereo" images, that
2   involved scaling photographs from different time periods and then superimposing them
3   to see if there were any changes in topography or elevation.  Overall, Mr. Glenn's
4   experience, technique and methods were credible.

5       Although credible, Mr. Glenn's observations were not found to be as 100%
6   accurate as he claimed during his testimony.   This is due to a couple likely mistakes in
7   observation identified in evidence presented by Grump.  Mr. Glenn was adamant that no
8   logging had occurred since 1989 in the entire Grump 66.5 acres.   He stated his
9   observations would have caught both selective logging and logging along the logging
10  roads of the Grump site.  Mr. Glenn stated that the only logging he would miss are trees
11  removed from clumps of trees where the remaining canopy had time to fill in canopy
12  spaces left by the tree removal.  Yet Russell Scott acquired a forest practices permit to
13  log 85,000 board feet within Grump's 66.5 acres in 2011.  Mr. Scott testified that he
14  logged 85,000 to 100,000 board feet with this permit. Mr. Scott did not provide any
15  documentation evidencing this logging, such as sales or trucking receipts.  It's possible
16  that Mr. Scott acquired a forest practices permit, then didn't use it and then later testified
17  under oath that he did use it.  That scenario, however, appears unlikely.  More likely, Mr.
18  Glenn missed the logging of 85,000-100,000 board feet on the 66.5 acres owned by
19  Grump.

20      Mr. Glenn also incorrectly identified the surface of the Port of Allyn parking lot
21  as asphalt.  It is undisputed from the testimony of Russell Scott and Earl Iddings that the
22  surface is black lava rock.  Mr. Iddings testified that from the air black lava rock looks
23  the same as asphalt.  However, Mr. Glenn was adamant when he initially testified on the
24  subject that the surface was asphalt.

25      Although Mr. Glenn's observations weren't 100% accurate, his stereo imaging of
26  photographs taken of the Grump pit were meticulous.   His methodology and his
27  experience still create a high degree of confidence in his findings.  The gravel pit area
28  was the central focus of his investigation and involved a much more limited area, less

Final Decision
PAGE 13

than two acres, than the 60+ Grump acres he reviewed for logging.  His findings on the pit are taken as more credible than his findings on the logging.   If logging did indeed occur as testified by Mr. Scott in 2011, that logging is not found to significantly undermine Mr. Glenn's conclusions, but does leave more room to doubt Mr. Glenn's findings in questionable circumstances.

One pertinent point regarding Mr. Glenn's findings is that it's not clear how current they are.  Mr. Glenn was not clear about the end date to his conclusion that no mining has occurred on the Glenn site.   The photographs he reviewed during his testimony only went up to June 2018.  In the absence of any other evidence in the record, Mr. Glenn's findings on no excavation are only taken to apply for the time period from 2012 through June 2018.

Mr.  Glenn's comments were corroborated by the observations of area residents. Pat Byrne lives directly across North Shore Road from the Scott property driveway. He's owned various pieces of equipment including excavators, dump trucks, and front loader tractors. Mr. Byrne testified from the time he purchased his property in 1992 until 2018, he'd seen no continuous mining activity on the property. He took a series of pictures of the Scott Pit property in June 2018. At the time, he saw no signs of heavy equipment use in the area in the prior three years. He stated he was at home during the County chip seal operations in 2014-2015. He witnessed trucks coming and going. Both times during the activity during 2014-15 and in April 2019 he observed and heard activity from the site. He stated the activity was "almost visceral when those trucks come, it's a cacophony that could wake the dead at times it gets very, very noisy". He did not testify to noticing the 2012 mining activity conducted by Moore. Therefore, it is possible Mr. Byrne might have missed mining of a similar scale in 2017.

Mr. Earl Iddings owns a construction business and lives adjacent to the upland portion of the Scott property. He testified the only time he's observed excavation activity on the Scott property since 2015 was in 2019.

Final Decision
PAGE 14

In total, the Intervenors provided Declarations from 14 households in the immediate vicinity who all stated they were aware of the County's activities in 2014-5 and of the 2019 mining activity but were not aware of and did not see or hear evidence of mining activity at the Grump Pit in 2017.  (Ex. I-93, I-94, I-95, I-96, I-97, I-98, I-100, I-101, I-102, I-103, I-104, I-105, I-106 and I-107). Mr. Larue, the County Roads Supervisor testified the only activity he'd seen on the site was the County's own activity and the 2019 mining. Mr. Larue has been driving by this pit multiple days per week every year for the last 15 years.

14.    February 2017 Mining Questionable.  Grump witnesses alleged some significant extraction activity in January through March 2017.   The evidence is somewhat questionable that this mining occurred.

One major discrepancy in the evidence is that the amount of mining in 2012 at the pit by Moore is similar to that allegedly mined in February through April, 2017, yet the Moore excavation was clear to Mr. Glenn's review of aerial photographs but the 2017 mining was not.  Mr. Russell Scott testified that in 2012, Mr. Moore had removed about 200 cubic yards of material. In comparing the 2011 to 2013 Aerial Photos (Exhibits I-3, I-4, I-66 and I-67), Mr. Glenn found there is an obvious difference in the amount of material on the pit floor. There is far more material hummocked at the pit face and on the pit floor in 2011 than in 2013 where the pit floor appears to have been leveled.

Jason Johnson alternately testified Olympic Trucking hauled either 50-60 cubic yards or 50-100 cubic yards out of the Scott Pit in February, 50 to 100 cubic yards more through March of 2017 and another 50-60 cubic yards in April 2017. Cumulatively, the total amount of yardage excavated from the pit would have been approximately 150-220 cubic yards of material, which is comparable to the approximately 200 cubic yards extracted by Moore in 2012.  Despite allegedly being similar in scale to the Moore excavation in 2012, Mr. Glenn found no evidence of extraction from 2016 to 2018. It is recognized that Mr. Glenn stated that he may not see excavations less than five feet deep and Russell Scott testified that the 2017 excavation was two to three feet deep, but the

Final Decision
PAGE 15

1  fact remains that the Moore work was clearly visible to Mr. Glenn, and that involved
2  similar amounts of material.

3       There is also testimony from various parties that were in the pit shortly after the
4  alleged excavation activity in February and March of 2017 and of surrounding neighbors.
5  Assuming the alleged mining activity did take place in 2017, at between 150 and 220
6  cubic yards of material, one would expect there would have been 15-20 trucks leaving
7  the site. As noted above in Finding of Fact No. 13, several parties were in the pit on or
8  after March or April of 2017. Of these, the most compelling is Solene who stated he was
9  in the pit in either late March or early April of 2017 when he got lost surveying his own
10  property. Mr. Solene stated there was no equipment of any kind on the property during
11  his visit in 2017. He noted in fact that if there'd been equipment on the site, it might have
12  cleared up his confusion as to the purpose of the chip seal. The property was overgrown,
13  showed no signs of excavation and looked the same from 2017 to his later visits in 2018.
14  Jason Johnson stated the loader had been brought into the pit in February 2017 and later
15  removed on April 22, 2017 (Ex. A-6, Invoice #35277). Mr. Johnson did not provide a
16  truck slip showing the date the loader was brought to the site. If the loader was indeed on
17  the property the whole time, Mr. Solene would have seen it.
18

19       Others who visited the property and found no signs of recent excavation were Mr.
20  Iddings who stated he hadn't seen signs of excavation in either of his May 2017,
21  December 2017 visits or later in 2018 and that in both cases he witnessed vegetation
22  overgrowth that appeared consistent from year to year; Mr. Anspach was at the pit and
23  took pictures on July 14, 2018 and noted the area was then covered in vegetation; and Mr.
24  Byrne who stated he has been on the property about once per year and was on the property
25  in June of 2018 saw no sign of equipment use in the prior three years. Each man stated
26  they had never witnessed any excavation in 2017 and saw just overgrown vegetation. The
27  2009 – 2016 progression is useful in that the vegetation is completely overgrown in 2009
28  (Exhibit I-73), whereas the useable area of the gravel pit floor is greatly expanded in 2012
29  with large amounts of materials against the pit face and immediately adjacent to it on the
30

Final Decision
PAGE 16

pit floor (Exhibit I-74). Ground level vegetation and vegetation on the pit face have been cleared as part of the 2012 excavation. The vegetation on the pit wall on the northeast portion of the pit appears to have grown, but not significantly between 2016 and 2018 (Exhibit I-75 and I-76).

The Intervenors presented declarations for multiple neighbors surrounding the Grump pit. Each stated that other than the County work in 2014-2015 and the 2019 mining activity, they knew of no other mining activity from 2015 to 2019 (See Finding of Fact No. 13). Despite being what Mr. Byrne referred to as a 'visceral' noise, none of these nearby neighbors detected mining activity in 2017 and never saw mining equipment enter or exit the site.

As evidence of the mining in February 2017, Grump presented a photo and testimony about a lowboy that got stuck on North Shore Road as it was trying to enter the Grump pit. A lowboy is a type of trailer used for hauling heavy equipment. Jason Johnson testified Peninsula Topsoil had widened the mine entrance drive in 2019 to allow access for a lowboy to deliver and remove mining equipment. Several Grump witnesses attested to a lowboy getting stuck at the mine entrance when it high centered and blocked North Shore Road for 45 minutes to an hour. Jack Johnson stated he couldn't remember if the lowboy got stuck in 2017 or 2019. Jason Johnson dated he did recall hearing about a lowboy getting stuck, but he wasn't working the site at the time. Jason Johnson stated the picture he'd seen (Ex. A-11) was a lowboy but he couldn't tell when the picture was taken. He speculated the lowboy got stuck in 2017 because the driveway had been improved in 2019. He stated they'd had difficulty getting the lowboy on and off the site in 2017 and that they'd had to load and unload on the asphalt road (North Shore Road). Russell Scott suggested but did not state that the lowboy was stuck prior to 2019. A February 13, 2017 diary entry from Kari Scott, Mr. Scott's mother, stated that the Johnsons were moving a lowboy into the pit and got stuck (Ex. A-23). None of the parties who were involved in the alleged work were either present on site or able to provide a specific year. No immediate neighbor recalls the lowboy getting stuck in the mine

Final Decision
PAGE 17

1  entrance in 2017 and no pictures were presented to document this claim by Grump. The

2  Belfair station of the Mason County Sheriff had no report of road closure that day. Melissa

3  Seals of the Mason County Sheriff's Office stated they had no record of a blockage on

4  North Shore Road between February 10 and February 15, 2017 though it is common for

5  a road blockage of any duration to be reported to the Sheriff's Office and an officer sent

6  to the scene.

7       It is also noteworthy that in the "green file" referenced in Finding of Fact No. 12

8  as being submitted to the County on February 17, 2017, Grump didn't mention the

9  February 14, 2017 work done just three days before.

10       Although the County and Intervenors presented compelling evidence that no

11  mining occurred in February, 2017, Grump presented some significant evidence to the

12  contrary.  Most notably, Grump presented two pictures, Ex. A-4 and A-5, which show

13  brush clearing and/or excavation work at the Grump pit.  These pictures were uploaded

14  to Flicker with a documented upload date of February 14, 2017.  Richard Scott testified

15  that he took the photo of the excavation on that date, but a County witness, Kell Rowen,

16  testified that the upload date can be changed by the holder of the Flicker account.  Ms.

17  Rowen also made light of the fact that Richard Scott's 2017 pit photographs were not

18  publicly accessible, but he had dozens of more private family photographs taken prior to

19  2014 that were publicly accessible.  Mr. Scott provided a reasonable explanation for this

20  – until 2014, using a different phone, he manually uploaded his photos to Flicker and

21  those were made public.   In 2014 he acquired a new phone and that phone automatically

22  uploaded his photos, but made those photographs only privately accessible.  Mr. Scott

23  was unaware of the difference in accessibility.   Although Mr. Scott could have changed

24  the upload date of Ex. A-4 and Ex. A-5, there is no evidence that he did so.  It is

25  unfortunate that no party was able to present the metadata of those photographs to clarify

26  the date they were taken.

27       In addition to the Flicker photographs, Jason Johnson testified that the excavator

28  depicted in the photograph was not used in 2019.  An examination of a YouTube video

29

30

Final Decision
PAGE 18

1  taken of the 2019 excavation work, Ex. 1-137, doesn't show the excavator depicted in

2  Ex. A-5. It's possible that the A-5 excavator was simply out of the camera view or not

3  used the day the video was taken, but Jason Johnson's testimony on this point does

4  corroborate Grump's position that mining was done on February 14, 2017.

5      It is not necessary to the resolution of this appeal whether any mining actually

6  occurred in February or March, 2017.  Consequently, since both sides have presented

7  compelling evidence on this issue, the issue is left as "somewhat questionable" whether

8  mining occurred in February and March, 2017.

9  15.    <u>April 22, 2017 Mining Likely Did Not Occur</u>.  The preponderance of evidence

10  establishes that mining activity likely did not occur on April 22, 2017 as alleged by

11  Grump witnesses.

12

13      Jason Johnson testified that he hauled 50-60 cubic yards out of the Grump pit on

14  April 22, 2017.  This work involved the only excavation work alleged by Grump after

15  April 3, 2017, except for the illegal activity that was stopped by the County on April 8,

16  2019. Jason Johnson testified that he had hauled 50-60 cubic yards from the Scott Pit to

17  a development project off Timberline, located 6 miles from the Scott Pit.  Jason Johnson

18  initially testified that he took the gravel from spoils that remained from mining allegedly

19  done in February 2017, and then subsequently modified his testimony that some material

20  had been taken from the bank.  On 7/23/20 surrebuttal, Russell Scott testified that on

21  April 22, 2017 Jason Johnson had "probably" done his excavation work in an area that

22  was started in February, 2017, specifically an area that was 2-3 feet deep, 80-100 feet

23  across and 50-60 feet wide extending from the ground to the left of the  stream stockpiles

24  depicted in Ex. I-45 to the bank behind the stockpiles.

25      The evidence establishing the absence of any activity in April is substantial, based

26  upon independent observations of no mining activity and highly dubious evidence

27  presented by Grump.  Overall, a major problem with the evidence presented by Grump

28  for all of its assertion in its 20-hour hearing was that none of the evidence was

29  independently verifiable.  Almost all of the documentation and testimony provided by

30

Final Decision
PAGE 19

1   Grump was made by family members associated with the Grump business or by lifetime
2   family friends with decades of close working relationships (i.e. the Johnsons, see Finding
3   No. 10).    Every single financial document and receipt presented by Grump was a
4   document prepared by Grump, Peninsula Topsoil or Olympic Trucking that could have
5   been easily manufactured for the appeal hearing.

6          Establishing that mining occurred in April 2017 at the Grump pit was critical in
7   showing that the mining activity hadn't ceased in the two years prior to the illegal mining
8   on April 8, 2019.  Doing work for a development project as alleged by Jason Johnson
9   would have presented an ideal opportunity for Grump to present an invoice, check or
10   bank records showing interaction with the third party that ordered the work for the
11   development project.   Yet despite the significance of such documentation, the only
12   document Grump provided was a 4/26/17 trucking slip prepared by Jason Johnson's
13   company, Olympic Trucking, if not himself, that covered the transport of a loader from
14   the Grump pit to the Peninsula Topsoil yard.  (Ex. A-6, Invoice #35277).

16          In addition to the absence of any documentation supporting claims of mining on
17   April 22, 2017, it is also improbable that anyone doing the mining would have found it
18   feasible.  Mr. Johnson noted that he acquired the 50-60 cubic yards for free from the
19   Grump pit. Mr. Johnson testified that acquiring the material elsewhere would have cost
20   $0.50 to $1.00 per cubic yard. Using the Grump pit as opposed to another pit thereby
21   saved Mr. Johnson a maximum of $60.  For this $60 cost savings, Mr. Johnson used a
22   hauling truck that according to him cost $2/minute to use.  As testified by Mr. Iddings on
23   7/23/20, the Grump Pit is six miles from the Timberline project, while the Huson gravel
24   pit is adjacent to it and the Bear Creek gravel pit is located three miles from the project
25   site. According to Bruce Carter 7/23/20 testimony, Peninsula Topsoil has DNR permits
26   for the Huson and Bear Creek pits.  Although Grump witnesses stated that the Huson pit
27   is inactive, aerial photography, Ex. I-144, and observations presented by Ken Van
28   Buskirk showed the pit as active.  Even if Huson could not be used for the Timberline
29   project, it is uncontested that the Bear Creek pit was available for mining at half the
30

Final Decision
PAGE 20

1  distance to the development project than from the Grump pit.  Jason Johnson testified that

2  the 50-60 cubic yards he hauled took 5-10 truckloads.  At $2/minute to operate a truck

3  for an extra three to six miles per load due to using Grump instead of Huson or Bear

4  Creek, it makes no financial sense to use the Grump pit.

5       The alleged April 22, 2017 mining also makes no sense from an operational

6  standpoint.  Earl Iddings, who owns a construction company with several pieces of

7  mining equipment, testified that gravel would not be extracted from the pit in the manner

8  testified by Jason Johnson.  Jason Johnson testified that he "pulled" gravel from the face

9  of the gravel pit bank behind some stream rock stockpiles.  As testified by Mr. Iddings

10  on 7/23/20, the embankment in question is near vertical with large trees and exposed roots

11  overhanging the top.  Mr. Iddings noted that any removal of gravel from that embankment

12  face could result in the trees toppling onto the person engaged in the excavation and for

13  that reason violates mining regulations.  Mr. Iddings also testified on 7/23/20 that he had

14  been in the pit in May and December of 2017 and again several times in 2018 after the

15  alleged April 2017 mining and that he did not see that any excavation in the area alleged

16  by Jason Johnson had occurred.  He noted that he saw no removal of vegetation in his

17  visits that would indicate any excavation in the pit area.  He also noted that the vegetation

18  along the banks as shown in photos I-45 and I-46 isn't consistent with the alleged clearing

19  that would have been done for pulling.  Finally, Mr. Iddings noted that the banks are still

20  vertical in I-45 and 46, not knocked back as testified by Mr. Johnson.

21

22       Corroborating Mr. Idding's testimony is the testimony from Mr. Solene, Mr.

23  Anspach and Mr. Byrne. Mr. Anspach was at the pit and took pictures on July 14, 2018.

24  He stated the whole area was covered in vegetation. Mr. Byrne stated he has been on the

25  property about once per year and was on the property in June of 2018. He stated he saw

26  no sign of equipment use in the prior three years. He never witnessed any excavation in

27  2017 and saw just overgrown vegetation. Mr. Solene stated he'd been on the property in

28  either March or April of 2017 and four times since. Under cross, Mr. Solene stated there

29  was no equipment of any kind on the property during his visit in 2017. He noted in fact

30

Final Decision
PAGE 21

1   that if there'd been equipment on the site, it might have cleared up his confusion as to the
2   purpose of the chip seal. The property was overgrown, showed no signs of excavation
3   and looked the same from 2017 to 2018.

4        In addition to the operational and economic infeasibility of the project, there is
5   also very high incentive to falsely stretch the February 2017 mining activity into April
6   2017.  There is no correspondence in the green file prepared in 2017 or any time thereafter
7   in the record that Grump had hired a lawyer to make its case for nonconforming use rights.
8   As testified by Brad Carey, Russell Scott and Jack Johnson expressed the belief in their
9   July 2018 with Mr. Carey that they were grandfathered in solely because of the Grump
10  pit mining activity in the 1950s and 1960s.  Mr. Scott and Mr. Johnson were not aware
11  that those rights could be lost through two years of inactivity. The earliest Mr. Scott and
12  Mr. Johnson would have been aware of this threat to their mining interest was the January
13  28, 2020 rescission interpretation, which identified the MCC provision that would
14  terminate their rights after two years of cessation of use.  At this point Mr. Scott and Mr.
15  Johnson would have realized there was a two-year gap between their February 2017
16  mining and the mining they did on April 8, 2019.  It would have been very tempting at
17  that point to stretch the mining activity that occurred in February 2017 to include some
18  additional mining on April 22, 2017.  That small modification of facts could make the
19  difference in their minds to whether or not Grump would lose its SM-6 mining rights.  Of
20  course, if no mining occurred in February 2017, that would mean that the Scotts and
21  Johnsons engaged in wholesale manufacturing of evidence and that therefore their
22  testimony would have very low credibility, including assertions of mining on April 22,
23  2017.
24

25        In addition to the high incentive to stretch the February mining into April 2017,
26  there is the testimony by Mr. Glenn that the vegetation growth depicted in photographs
27  of the pit is inconsistent with mining in February 2017, and by extension, additional
28  mining in April 2017.  There is also the testimony of Mr. Glenn of seeing no excavation
29  of the site in 2017 and the testimony of neighbors that there was no activity at the site as
30

Final Decision
PAGE 22

outlined in Finding of Fact No. 14. Mr. Iddings stated he didn't see any material that was disturbed on the native fill side in 2017 or 2018 when he was in that location. He stated he would have seen if any material had been extracted by either direct indication on the pit face or from equipment tracks in the gravel. There was no indication of that type of disturbance. Further, the banks are still vertical in Ex. I-45 and 46, not knocked back as testified by Jason Johnson. Overall, there is a substantial and overwhelming amount of evidence that there was no excavation on April 22, 2017 and the Appellants offer no evidence in response except the testimony of two witnesses with an ownership or close business relationship with Grump and a single trucking slip dated April 26, 2017 that reveals very little of what was done on April 22, 2017. Given all these circumstances, any reasonably minded person would have to conclude that the preponderance of evidence establishes that no mining activity occurred on April 22, 2017.

16.    <u>No Test Pits Dug in April or May 2017</u>. The preponderance of evidence establishes that test pits were likely not dug in April or May 2017 as alleged by Grump witnesses. The evidence is fairly compelling that the test pit area was overgrown with vegetation and that such vegetation would have been cleared to afford access to the backhoe used by Mr. Johnson to dig the test pit. Yet Mr. Glenn found the area overgrown with vegetation both before and after the alleged digging of the test pits. Further, as testified by Mr. Iddings, who owns a construction business with mining equipment, test pits aren't dug in the middle of logging roads for several practical reasons. Finally, Jason Johnson's testimony regarding any work in April 2017 lacks credibility given that his testimony regarding pit excavation was soundly refuted by substantial evidence as outlined in Finding No. 15.

Jason Johnson testified in late April or May 2017 he dug test pits in the middle of the upper access road above the pit and one farther up the hill. Mr. Johnson stated the test pits were dug 10-15 feet deep, which is the extent to which the machine can dig. The holes were 2-3 feet wide, corresponding with the width of the backhoe's bucket. He further stated these pits were then filled in for safety. He speculated a layperson would

Final Decision
PAGE 23

1   not be able to distinguish the test pit because they were returned to their prior topography.

2   Mr. Johnson stated they were digging the test pits to see if the gravel was at least 10 feet

3   deep in the upper area.

4       Mr. Johnson stated the material from the test pits was not sent out to a geologist

5   as he's been in the business for 20 years and can't remember ever sending out a sample

6   from test pits.

7       Mr. Earl Iddings testified that doing test pits in the road makes no sense.  It's not

8   industry standard to dig a test pit hole in a road when you have plenty of acreage around

9   your road.  A test pit dug in the roadway jeopardizes the roadway's integrity by creating

10  a soft spot, unless a compactor is used to restore the road surface. There is no evidence in

11  the record of a compactor being brought to the Grump pit. Additionally, a test pit dug in

12  the roadway could hit a water table and wash the road away.  At the Grump pit the area

13  surrounding the logging roads is soft vegetation such as scotch broom. It would make

14  more sense to dig there than in the compacted roadway surface.  Mr. Iddings testified he

15  was at the road in May 2017 chasing after his dog and saw no signs of test pitting.  The

16  road above his property is impassable and they would have had to bulldoze their way to

17  the alleged test pit area, pushing away the alders and scotch broom along the sides of the

18  road.

19

20      Mr. Glenn had looked at the alleged test pit area closely during the appeal hearing

21  and found that brush had steadily grown in this logging area and made it impassable by

22  April/May of 2017.  His observations were confirmed by the testimony of Iddings who

23  noted that from his site visits starting in 2005-6 and then twice or three times per year

24  from 2015 forward, he found the area increasingly overgrown and eventually impassable

25  to even pedestrians.  As testified by Mr. Glenn, if mining equipment had been brought up

26  to that area in late April or early May 2017, the road vegetation would have shown up as

27  cleared in the 2018 photographs he looked at. He testified that instead he viewed

28  increasingly overgrown vegetation in this area.

29

30

Final Decision
PAGE 24

17.     No Mining Activity Between April 3, 2017 and April 3, 2019.   There was no mining at the Grump site between April 3, 2017 and April 3, 2019.  The testimony of Rick Glenn and neighboring property owners made it more likely than not that over this two-year period no mining activity had occurred for the reasons identified in Finding of Fact No. 13.  Although it's unclear whether Mr. Glenn's observations stretched all the way into April, 2019, the historical infrequency of mining identified in Finding of Fact No. 12 coupled with the testimony of no activity by the neighbors establishes that more likely than not no mining occurred until April 8, 2019.  Grump did not overcome this evidence by assertions that mining occurred on April 22, 2017 or that test pits were dug in April or May 2017 as well for the reasons identified in Findings No. 15 and 16.  For these reasons it is determined that the preponderance of evidence establishes that there was no mining activity between April 3, 2017 and April 3, 2019.

**Conclusions of Law**

**Procedural:**

1.  Authority of Hearing Examiner. MCC 15.03.050(G) provides the Examiner with the authority to review and issue a final decision upon all appeals of administrative decisions, including appeals of administrative determinations.

2.  Nonconforming Use Rights Set by SM-6 Certification Terminated by Two Year Rule. For the reasons identified in the Examiner's first and second summary judgment motions of this appeal, in order to terminate the nonconforming use rights of Grump and thereby have its January 28, 2020 administrative determination sustained, Mason County has the burden of establishing by a preponderance of evidence that Grump ceased mining activity for any two year period between July 1, 2015 and April 3, 2019.  The legal analysis of the first and second summary judgment motions of this appeal is adopted by reference for this Final Decision.  Mason County has met its burden of proof for the reasons identified in Finding of Fact No. 17.  For this reason, Grump has lost the nonconforming use rights set by the SM-6 certification and the County's SM-6 Rescission is sustained.

Final Decision
PAGE 25

3.   <u>Nonconforming Use Rights for Hobby Mine Use Not Affected by this Decision</u>.  As noted in the overview of this Decision, it is important to note that the nonconforming use rights assessed by this Decision are for the mining proposed in Grump's reclamation permit.  They are not for the continuation of Grumps historical sporadic and infrequent use.  This distinction is an important basis of this Decision, because there is a line of cases that holds that infrequent activity that exceeds the time limits of nonconforming use termination clauses can still qualify as nonconforming uses if that type of activity is a long standing practice of the use.

An excellent and current case that surveys the court opinions on nonconforming use rights of infrequently used quarries is *Vickers v. Franklin Cnty. Bd. of Commissioners*, 444 P.3d 380 (Kan. Ct. App. 2019).  *Vickers* involved the nonconforming use rights of a quarry subject to a nonconforming use termination clause that nonconforming use rights "voluntarily discontinued" for a period of six consecutive calendar months shall not thereafter be resumed. The regulations specifically eliminated a requirement to establish intent to abandon.  The rock quarry at issue was not involved in any excavation, but rather sold a modest amount of rock it had excavated in years past in the following amounts:  3,283 tons in 1996, 66.52 tons in 1997, 112 tons in 1998, 2,246 tons in 1999, and 1912 tons in 2000. No other use—other than operating and maintaining the Quarry—occurred on the land from the date the Quarry was established. Significantly, the court ruled that even though there were periods exceeding six months between rock sales, the Court did not find the quarry's nonconforming use rights to be terminated because of these sales intervals:

> *We decline to adopt Plaintiffs' suggestion that a nonconforming quarry use is invariably abandoned between rock sales. A quarry is a unique business. Although intent to abandon is not relevant to the 1998 Zoning Regulations, courts widely recognize that quarry operations are inherently sporadic and abandonment may not be inferred from the mere fact that blasting or crushing stopped or rock sales fluctuated. As the court in Tigard Sand observed: "[Q]uarry uses are generally more likely than some other types of uses to be characterized by variations in activity levels and, when that is so, that their 'continuity' should be gauged accordingly." 149 Or. App. at 423-24.*

Final Decision
PAGE 26

1   In reaching this conclusion, the *Vickers* court surveyed court opinions from several
2 jurisdictions on what level of activity is necessary to maintain nonconforming use status
3 for mining operations.  One pertinent case it came across was *Polk County. v. Martin*,
4 292 Or. 69, 636 P.2d 952 (1981), which recognized that although the sporadic and
5 intermittent use of the mine under its review was relevant to the scope of the permitted
6 nonconforming use, it did not negate the existence of the on-going quarry business.

7      At issue in the *Polk County* case was application of a nonconforming use
8 provision to a mine of limited historical activity.  The provision in question, ORS 215.130
9 (5), simply provided that a lawfully created use of land may continue despite changes in
10 zoning laws.  In construing ORS 215.130 (5), the *Polk* court found as follows:
11

12     *A sporadic and intermittent use is sporadic and intermittent, but it may*
13     *nonetheless be a "lawful use" under ORS 215.130 (5). The nature and*
    *extent of the prior lawful use determines the boundaries of permissible*
14     *continued use after the passage of the zoning ordinance. The significant*
15     *thing is that a sporadic and intermittent use may give rise to a permitted*
16     *nonconforming use, with the extent of the permitted nonconforming use*
    *limited to the sporadic and intermittent use that existed prior to the*
17     *enactment of the zoning ordinance.*
18

19 292 Or. at 76.

20 Under the line of cases surveyed in the *Vickers* opinion, Grump might be able to
21 successfully argue that its sporadic and intermittent use, as outlined in Finding of Fact
22 No. 12, entitles it to nonconforming use rights.  Under that same line of cases, it might
23 even be able to successfully assert that its storage and occasional use of rock stockpiles
24 qualifies as continuous mining use. However, under the *Polk* holding that would only
25 entitle it to the nonconforming use rights of a sporadic and intermittent mining operation
26 that stores and occasionally uses stockpiles.  As outlined in the Findings of Fact, the
27 Grump operation has been limited to 1.18 acres for more than 60 years.  In terms of
28 mining area, Grump only needs to get a reclamation permit if it seeks to mine more than
29 three acres. *See* RCW 78.44.031(17)(a).
30

Final Decision
PAGE 27

1    In short, the SM-6 certification issued by the County found nonconforming use

2   rights across the entirety of a 66.5 acre site for a minimum three acre mining operation,

3   for a site that has been used only a handful of times over the last twenty-five years for a

4   pit less than 1.18 acres in size.  The type of mining that Grump had in mind with its

5   reclamation permit had little relation to the mining it has been doing for decades.  Mason

6   County correctly rescinded its SM-6 certification when it discovered that Grump was not

7   engaged in any mining that was similar to what it had proposed.

8       The County's two-year termination deadline set by MCC 17.05.016A was wholly

9   appropriate for the type of mining that Grump was seeking in its reclamation permit.  The

10  two-year deadline not only serves as a proportionate response to the type of investment

11  one would expect for a mining activity of the scale necessary for a reclamation permit, it

12  also provides some fair notice to a surrounding community. As testified by Mr. Iddings,

13  he would not have purchased his home if he thought he knew he was going to be living

14  next to a gravel pit.  No doubt that would be the sentiment of most people in the

15  surrounding Belfair community.  Given the lack of activity of the Grump pit for decades

16  and the zoning of that property as RR-5 for decades, surrounding residents cannot be

17  reasonably expected to have foreseen that the Grump property could explode into a

18  massive 66.5-acre mining operation at any time.  As outlined in the summary judgment

19  rulings of this case, nonconforming use rights are protected property rights.  However, as

20  a right protected by constitutional due process and takings clauses, the public interest is

21  a pertinent factor in balancing the extent of that right.  That public interest would be

22  seriously compromised if Grump were allowed to sit on its rights for decades and then

23  destroy the character of its surrounding community when it finally decided it was in its

24  economic interest to do so.

25

26      A final point on the extent of Grumps protected nonconforming use rights is

27  recognition that a seminal Washington nonconforming use case strongly supports the

28  concept that nonconforming use rights can be intensified.  See *Keller v. Bellingham*, 92

29  Wn. 2d 726 (Wash. 1979).  However, *Keller* did recognize that at some point a change in

30

Final Decision
PAGE 28

1  intensity results in a change of use that is no longer protected as a nonconforming use

2  right:

3    *When an increase in volume or intensity of use is of such magnitude as to*

4    *effect a fundamental change in a nonconforming use, courts may find the*
  *change to be proscribed by the ordinance. 1 R. Anderson, supra at § 6.47;*

5    *8 A. McQuillin, Municipal Corporations § 25.207 (3d ed. 1976).*

6    *Intensification is permissible, however, where the nature and character of*
  *the use is unchanged and substantially the same facilities are used.*

7    *Jahnigen v. Staley, 245 Md. 130, 137, 225 A.2d 277 (1967). The test is*

8    *whether the intensified use is "different in kind" from the nonconforming*
  *use in existence when the zoning ordinance was adopted. 3 A. Rathkopf,*

9    *The Law of Zoning and Planning, ch. 60-1, § 1 (4th ed. Cum. Supp. 1979).*

10

11  For reasons previously discussed, the type of increase in mining contemplated by Grump

12  in its DNR application effected a fundamental change in use, from a hobby mine used

13  every few years to a mining operation over a 66.5-acre area that necessitates a reclamation

14  period.   The proposed mining is more than just a change in intensity.   Therefore, the

15  *Vickers* line of cases do not justify converting the nominal historical mining activity of

16  the Grump mine into protected nonconforming use rights significant enough to

17  necessitate a reclamation permit.

18

19

20

21

22

23

24

25

26

27

28

29

30

Final Decision
PAGE 29

1

**Decision**

2      Grump's appeal is denied.  Mason County's rescission of its SM-6 Certification

3   on January 28, 2020 is sustained on the grounds that Grump lost its nonconforming use

4   mining rights through cessation of use from April 3, 2017 through April 3, 2019.

5

6      ORDERED this 11th day of August 2020[4].

7

8

9   Phil A.Olbrects
    Mason County  Hearing Examiner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [4] A series of minor non-substantive corrections were made to this Decision on August 27, 2020 in response

29   to Intervenor's Errata Request dated August 21, 2020.  The parties were advised that the requested
     corrections would be made without a change in the issuance date for purposes of LUPA appeal if there

30   were no objections from the parties.  No parties made any objection to the requested corrections.

Final Decision
PAGE 30